JULIA CATHERINE BOSEMAN, PLAINTIFF v. MELISSA ANN JARRELL, DEFENDANT AND MELISSA ANN JARRELL, THIRD-PARTY PLAINTIFF v. JULIA CATHERINE BOSEMAN AND NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, THIRD-PARTY PLAINTIFF

No. 416PA08-2

(Filed 20 December 2010)

1. **Adoption— subject matter jurisdiction—unmarried couple—artificial insemination—prior parental rights not terminated**

 An adoption decree was void *ab initio* where the petition sought relief that does not exist under the North Carolina statutes. Plaintiff became an adoptive parent without the termination of defendant's relationship with the child after the unmarried couple planned and conceived their son through an anonymous sperm donor.

2. **Child Support, Custody, and Visitation—custody—artificial insemination—voluntarily creating new family unit—best interests of child test**

 The trial court did not err by applying the best interests of the child standard in a custody decision where defendant and plaintiff were not married but decided to bring a child into their relationship through an anonymous sperm donor and acted together as parents to the child. Defendant intentionally and voluntarily created a family unit in which plaintiff acted as a parent, with no indication that defendant intended the family unit to be temporary.

Justice TIMMONS-GOODSON dissenting.

Justice HUDSON dissenting.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, —— N.C. App. ——, 681 S.E.2d 374 (2009), affirming in part, vacating in part, and remanding in part judgments and orders entered on 14 January 2008, 6 February 2008, 14 February 2008, 20 March 2008, and 16 April 2008, all by Judge Lillian B. Jordan in District Court, New Hanover County. Heard in the Supreme Court 8 September 2010.

BOSEMAN v. JARRELL

[364 N.C. 537 (2010)]

*Lea, Rhine & Rosbrugh, PLLC, by James W. Lea, III, Lori W. Rosbrugh, and Holli B. Newsome, for plaintiff/third-party defendant-appellee.*

*Ward and Smith, P.A., by John M. Martin and Leslie G. Fritscher, for defendant/third-party plaintiff-appellant.*

*Roy Cooper, Attorney General, by Mabel Y. Bullock, Special Deputy Attorney General, for North Carolina Department of Health and Human Services, third-party defendant-appellee.*

*Tami L. Fitzgerald, Lloyd T. Kelso, Julee T. Flood, and Deborah J. Dewart, for American College of Pediatricians, Christian Action League of North Carolina, North Carolina Family Policy Council, NC4Marriage, and Christian Family Law Association, amici curiae.*

*Tharrington Smith, L.L.P., by Jill Schnabel Jackson, for American Psychological Association, National Association of Social Workers, and North Carolina Chapter, National Association of Social Workers, amici curiae.*

*Gailor Wallis & Hunt PLLC, by Cathy C. Hunt, for Evan B. Donaldson Adoption Institute, National Center for Adoption Law and Policy, Barton Child Law & Policy Center, Center for Adoption Policy, and Katharine T. Bartlett, Naomi Cahn, June Carbone, Maxine Eichner, Joan Heifetz Hollinger, and Barbara Woodhouse, amici curiae.*

*Kenneth S. Broun, UNC School of Law, for Law Professors;[1] and Ellen W. Gerber for North Carolina Association of Women Attorneys, amici curiae.*

*McGuire Woods LLP, by Bradley R. Kutrow and Monica E. Webb; and Cleary Gottlieb Steen & Hamilton LLP, by Carmine D. Boccuzzi, pro hac vice, for North Carolina Chapter of American Academy of Pediatrics, amicus curiae.*

*Ellis & Winters, LLP, by Jonathan D. Sasser, for American Civil Liberties Union, American Civil Liberties Union of North Carolina Legal Foundation, Equality North Carolina Foun-*

---

1. These professors are Jennifer Collins, Michael Kent Curtis, Shannon Gilreath, and Suzanne Reynolds, Wake Forest University School of Law; John Martin Conley, Maxine Eichner, Holning Lau, Gene R. Nichol, and Phillip A. Pucillo, University of North Carolina School of Law; Adrienne M. Fox, Susan E. Hauser, Lydia E. Lavelle, and Kia H. Vernon, North Carolina Central University School of Law; and Sonya Garza, Elon University School of Law.

*dation, and Lambda Legal Defense and Education Fund, Inc.,
amici curiae.*

*Alliance Defense Fund, by Austin R. Nimocks, pro hac vice; and
Law Offices of Keith A. Williams PA, by Keith A. Williams, for
Family Research Council, amicus curiae.*

NEWBY, Justice.

In this case we must determine the validity of an adoption decree
entered in the Durham County District Court at the request of
Wilmington residents. If the decree is invalid, we must also determine
whether defendant acted inconsistently with her constitutionally pro-
tected, paramount parental status. Because the General Assembly did
not vest our courts with subject matter jurisdiction to create the type
of adoption attempted here, we hold that the adoption decree at issue
is void *ab initio*. However, we also conclude that by intentionally cre-
ating a family unit in which defendant permanently shared parental
responsibilities with plaintiff, defendant acted inconsistently with
her paramount parental status. Thus, the District Court, New
Hanover County, ("the trial court") did not err by utilizing the "best
interest of the child" standard to make its custody award. As such, we
reverse the Court of Appeals' decision that the adoption decree is
valid and affirm as modified its conclusion leaving undisturbed the
trial court's decision that the parties are entitled to joint custody of
the child.

Plaintiff and defendant (collectively, "the parties") met in 1998. At
that time, plaintiff lived in Wilmington, North Carolina, and defendant
lived in Rhode Island. The first time they met, they "discussed their
desires to have children." Roughly one month later, the parties began
a romantic relationship. From the outset, the parties continued to
voice their desires to have a child. In the spring of 1999, defendant
moved from Rhode Island to Wilmington, and the parties began living
together as domestic partners.

In May of 2000 the parties initiated the process of having a child.
They decided that defendant would actually bear the child, but both
parties would otherwise jointly participate in the conception process.
The parties agreed to choose an anonymous sperm donor and re-
searched and discussed the available options. They also attended the
medical appointments necessary both to impregnate defendant and
to address her prenatal care. Plaintiff read to the minor child "in the
womb and played music for him." Plaintiff also cared for defendant
during the pregnancy and was present for the delivery. Defendant

eventually gave birth to the minor child in October of 2002, and the parties jointly selected his first name.

Following the child's birth, the parties held themselves out as the parents of the minor child. They gave the minor child a hyphenated last name composed of both their last names. They also "had a baptismal ceremony for the child at the plaintiff's church during which they publicly presented themselves to family and friends as parents of the child." Further, each of the parties integrated the minor child into their respective families and each family accepted the minor child.

Within the home, the parties shared "an equal role" in parenting. Plaintiff's parenting skills were found to be "very attentive, very loving, hands on and fun." Defendant was found to be "very hands-on and patient in parenting" and to "reprimand[] [the minor child] by talking to him in a nice way." As a result of occupational responsibilities, each party was occasionally required to be temporarily away from their home. During such an absence, the party at home would care for the child. Moreover, the minor child treated each of the parties as a parent. The child refers to plaintiff as "Mom" and to defendant as "Mommy." As the trial court stated, the minor child "shows lots of love and respect for both parties." ·"Each party agrees that the other is and has been a good parent," and defendant even "testified that she thinks it is important for the plaintiff to be in" the minor child's life.

In 2004 the parties discussed the prospect of plaintiff adopting the minor child. The parties sought an adoption by which plaintiff would become a legal, adoptive parent while defendant would remain the minor child's legal, biological parent. According to defendant, in 2005 plaintiff stated "that she had 'found a way' " to adopt the minor child. Plaintiff informed defendant that the type of adoption they sought was "being approved in Durham County, NC."

Shortly thereafter, in June of 2005, the parties asked the District Court, Durham County, ("the adoption court") to make plaintiff an adoptive parent of the minor child while not also terminating defendant's relationship with the child. To accomplish their goal, the parties requested in the petition and accompanying motions that the adoption court not comply with (1) the statutory requirement under N.C.G.S. § 48-3-606(9) that defendant's written consent to the adoption contain an acknowledgment that the adoption decree would terminate her parental rights and (2) the statutory requirement of

BOSEMAN v. JARRELL

[364 N.C. 537 (2010)]

N.C.G.S. § 48-1-106(c) that an adoption decree "severs the relationship of parent and child between the individual adopted and that individual's biological or previous adoptive parents." Defendant's consent to the adoption reiterated these conditions and was contingent on the non-enforcement of these statutory provisions.

On 10 August 2005, the adoption court agreed to the parties' request, determined defendant's limited consent was sufficient, and entered an adoption decree. The decree stated that it "effects a complete substitution of families for all legal purposes and establishes the relationship of parent and child . . . between . . . petitioner and the individual being adopted," while simultaneously "not sever[ing] the relationship of parent and child between the individual adopted and that individual's biological mother." After finding that the Division of Social Services would not index this type of adoption, the adoption court instructed the clerk "not . . . to comply with" a statutory requirement that the clerk of court transmit a copy of the adoption decree to the Division, instead ordering that the clerk "securely maintain this file in the clerk's office."

In May of 2006, the parties ceased their relationship. Subsequently, plaintiff, without being ordered to do so, continued to provide "most of the financial support for the partnership" and for the minor child. Nonetheless, defendant limited plaintiff's contact with the minor child following the parties' separation. She did so while admitting "that the plaintiff is a very good parent who loves [the minor child] and that [the minor child] loves [plaintiff]."

Relying in part on the adoption decree, plaintiff filed in the trial court a complaint and an amended complaint seeking custody of the minor child. In response, defendant attacked the adoption decree, arguing that it was void *ab initio*, and contended that plaintiff otherwise could not seek custody of the minor child.

The trial court ultimately awarded the parties joint legal custody of the minor child. That court did not reach the merits of defendant's contention regarding the validity of the Durham County adoption decree. The trial court reasoned that it did "not have jurisdiction to declare void" another District Court Judge's order entered in another judicial district in North Carolina. Thus, the court determined that plaintiff "is a parent of the minor child . . . in that the aforementioned Decree of Adoption has not been found to be void by this court or any other court." The court also concluded that "defendant has acted inconsistent with her paramount parental rights and responsibilities."

Then, after determining that the "parties are fit and proper persons to have custody of their minor son," the court applied the "best interest of the child" standard to conclude that the parties should have "joint legal custody of the minor child." Defendant appealed.

The Court of Appeals concluded that the adoption decree in this case is valid and left intact the trial court's custody determination. *Boseman v. Jarrell,* —— N.C. App. ——, 681 S.E.2d 374 (2009). After reviewing Chapter 48 of our General Statutes, the Court of Appeals concluded that the adoption in this case comports with the "intent and purposes" of both our adoption law as a whole and "the specific provisions" of it at issue here. *Id.* at ——, 681 S.E.2d at 381. The Court of Appeals stated that N.C.G.S. § 48-2-607(a) prevents defendant from otherwise challenging the adoption decree's propriety, and, therefore, the decree causes plaintiff to be a legal parent of the minor child. *Id.* at ——, 681 S.E.2d at 381-82. The Court of Appeals also determined that plaintiff's status as a parent and the trial court's conclusion that the parties "are fit and proper persons for custody of the child, fully support [the trial court's] custody award." *Id.* at ——, 681 S.E.2d at 381. On 28 January 2010, we allowed defendant's petition for discretionary review of the Court of Appeals' decision.

[1] Defendant contends that a court is prohibited from choosing not to enforce the provisions of N.C.G.S. § 48-1-106(c) and N.C.G.S. § 48-3-606(9). Defendant argues that these provisions are mandatory in an adoption proceeding under Chapter 48 of our General Statutes. Because the adoption court crafted a remedy not recognized by the adoption statutes, defendant maintains that the adoption court lacked subject matter jurisdiction to enter the adoption decree at issue in this case, and the decree is, therefore, void *ab initio*. Plaintiff responds that the adoption court "was acting within its subject matter jurisdiction to preside over adoption proceedings" as set forth in N.C.G.S. § 48-2-100. Further, plaintiff asserts that, given the General Assembly's desire to have Chapter 48 "liberally construed and applied to promote its underlying purposes and policies," N.C.G.S. § 48-1-100(d) (2009), these statutory provisions do not have to be enforced in every adoption proceeding because they are designed only to protect the biological parent.

The law governing adoptions in North Carolina is wholly statutory. *Wilson v. Anderson,* 232 N.C. 212, 215, 59 S.E.2d 836, 839 (1950). "Adoption is a status unknown to common law . . . ." *Id.* Thus, to determine whether a court may proceed under Chapter 48 while choosing not to enforce the requirements of N.C.G.S. § 48-1-106(c)

and N.C.G.S. § 48-3-606(9), we must examine the text of our adoption statutes.

Through Chapter 48 of our General Statutes, our legislature has provided for three types of adoptions of minor children. The first is referred to as a "direct placement" adoption. N.C.G.S. § 48-3-202(a) (2009). In that type of adoption, our legislature envisioned a complete substitution of families. *Id.* § 48-1-106(a) (2009). A "parent or guardian must personally select a prospective adoptive parent," *id.* § 48-3-202(a), and is required to "execute a consent to the minor's adoption pursuant to [N.C.G.S. §§ 48-3-601 to 48-3-610]," *id.* § 48-3-201(b) (2009), acknowledging that the adoption will terminate the child's relationship with the parent, *id.* § 48-3-606(9) (2009). The second is referred to as an "[a]gency placement" adoption. *Id.* § 48-3-203 (2009). In such an adoption, the "agency may acquire legal and physical custody of a minor for purposes of adoptive placement only by means of a relinquishment pursuant to [N.C.G.S. §§ 48-3-701 to 48-3-707] or by a court order terminating the rights and duties of a parent or guardian of the minor." *Id.* § 48-3-203(a). The agency is then responsible for placing the minor for adoption. *See id.* § 48-3-203(b), (d). The third type is the stepparent adoption. *Id.* § 48-4-100 (2009). A stepparent is defined as "an individual who is the spouse of a parent of a child, but who is not a legal parent of the child." *Id.* § 48-1-101(18) (2009). Generally speaking, when a stepparent adopts the child of his or her spouse, the child must consent if twelve or more years of age, and the child's parents and any guardian must consent. *Id.* § 48-4-102 (2009). Indicating the comprehensive and limiting nature of this statutory procedure, the General Assembly has also explicitly provided for the adoption of adults, *id.* §§ 48-5-100 to 48-5-103 (2009), and the readoption by former parents of both adults and minors, *id.* §§ 48-6-100 to 48-6-102 (2009). According to plaintiff, the parties here presented a modified direct placement adoption that explicitly omitted the requirements of N.C.G.S. §§ 48-1-106(c) and 48-3-606(9).

In N.C.G.S. § 48-1-106, the General Assembly declared the "[l]egal effect of [a] decree of adoption" in a direct placement adoption. *Id.* § 48-1-106 (2009). That statute provides in pertinent part:

(a) A decree of adoption effects a complete substitution of families for all legal purposes after the entry of the decree.

(b) A decree of adoption establishes the relationship of parent and child between each petitioner and the individual being

adopted. From the date of the signing of the decree, the adoptee is entitled to inherit real and personal property by, through, and from the adoptive parents in accordance with the statutes on intestate succession and has the same legal status, including all legal rights and obligations of any kind whatsoever, as a child born the legitimate child of the adoptive parents.

(c) A decree of adoption severs the relationship of parent and child between the individual adopted and that individual's biological or previous adoptive parents. After the entry of a decree of adoption, the former parents are relieved of all legal duties and obligations due from them to the adoptee, except that a former parent's duty to make past-due payments for child support is not terminated, and the former parents are divested of all rights with respect to the adoptee.

*Id.* § 48-1-106(a)-(c). With this statute the legislature provided, *inter alia*, that ·a direct placement adoption decree terminates the adoptee's relationship with his or her former parent or parents. *Id.* § 48-1-106(c).

The provisions of N.C.G.S. § 48-1-106 establish the relief that may be issued by a court in an adoption proceeding. The legislature instructed that in a direct placement adoption the court may issue only an adoption decree that "effects a complete substitution of families." *Id.* § 48-1-106(a). The General Assembly directed our courts to enter adoption decrees that "sever[] the [former] relationship of parent and child," *id.* § 48-1-106(c), and "establish[] the [new] relationship of parent and child," *id.* § 48-1-106(b). Our legislature expressly required the dictates of N.C.G.S. § 48-1-106 to be stated in a direct placement adoption decree. *Id.* § 48-2-606(a)(6) (2009) ("A decree of adoption *must state* at least . . . [t]he effect of the decree of adoption *as set forth in G.S. 48-1-106* . . . ." (emphasis added)). There is no language in our statutes authorizing the issuance of any other relief. Accordingly, direct placement adoption decrees issued under Chapter 48 must have the effect the General Assembly established in N.C.G.S. § 48-1-106.

Further, the legislature requires that when consenting to the direct placement adoption of their children, parents acknowledge the effect an adoption decree has on their rights and responsibilities. In N.C.G.S. § 48-3-606, titled "Content of consent; *mandatory provisions*," the legislature provides that a parent's consent to the adoption of her child

must be in writing and state . . . [t]hat the individual executing the consent understands that *when the adoption is final, all rights and obligations of the adoptee's former parents or guardian with respect to the adoptee will be extinguished,* and every aspect of *the legal relationship between the adoptee and the former parent or guardian will be terminated.*

*Id.* § 48-3-606(9) (emphasis added). Thus, this statute ensures that a parent understands the direct placement adoption will totally sever her relationship with the child being adopted.

If " 'the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein.' " *In re D.L.H.,* 364 N.C. 214, 221, 694 S.E.2d 753, 757 (2010) (citation omitted). This is especially true in the context of adoption, which is purely a creation of statute. *See Wilson,* 232 N.C. at 215, 59 S.E.2d at 839. With direct placement adoptions, the General Assembly stated in these statutes that an adoption decree must sever the former parent-child relationship. Further, the legislature included no language allowing for the issuance of a decree that does not fulfill this mandate. It did so despite allowing for the alteration of other provisions of Chapter 48. *See, e.g.,* N.C.G.S. § 48-3-501 (2009) (*"Unless the court orders otherwise,* when a parent . . . ." (emphasis added)); *id.* § 48-3-502(a) (2009) (*"Unless the court orders otherwise,* during a proceeding . . . ." (emphasis added)); *id.* § 48-4-101(3) (2009) (allowing a court to dispense with several specific statutory requirements "[f]or cause"). Because the General Assembly's chosen language in these statutes is clear and unambiguous, courts are without power to "liberally construe[]," *id.* § 48-1-100(d), that language. Accordingly, a court is without authority to disregard these statutes.

In N.C.G.S. § 48-2-100, titled "Jurisdiction," our General Assembly established prerequisites for our courts to obtain jurisdiction over adoption proceedings. *Id.* § 48-2-100 (2009). At the relevant time, that statute stated in pertinent part:

(b) Except as provided in subsection (c) of this section, jurisdiction over adoption proceedings commenced under this Chapter exists if, at the commencement of the proceeding:

(1) The adoptee has lived in this State for at least the six consecutive months immediately preceding the filing of

> the petition or from birth, and the prospective adoptive parent is domiciled in this State; or
>
> (2) The prospective adoptive parent has lived in or been domiciled in this State for at least the six consecutive months immediately preceding the filing of the petition.

*Id.* § 48-2-100 (2005).[2] Thus, pursuant to the text of this statute, our courts have subject matter jurisdiction of adoption proceedings "commenced under" Chapter 48 of our General Statutes.

To commence an adoption proceeding under Chapter 48 of our General Statutes, a petitioner must be seeking an adoption available under Chapter 48. *See id.* § 48-2-301(a) (2009); *Wilson,* 232 N.C. at 215, 59 S.E.2d at 839 ("Adoption . . . can be accomplished only in accordance with provisions of statutes enacted by the legislative branch of the State government."). In defining both "[w]ho may adopt" and "[w]ho may be adopted," the legislature emphasized that adoptions may occur only as provided in Chapter 48. N.C.G.S. § 48-1-103 (2009) ("Any adult may adopt another individual *as provided in this Chapter . . . .*" (emphasis added)); *id.* § 48-1-104 (2009) ("Any individual may be adopted *as provided in this Chapter.*" (emphasis added)). Further, under N.C.G.S. § 48-2-301, titled "Petition for adoption; who may file," the legislature provided only that "[a] prospective adoptive parent," someone who is attempting an adoption "provided in" Chapter 48, *id.* § 48-1-103, may file an adoption petition, *id.* § 48-2-301(a).

Plaintiff was not seeking an adoption available under Chapter 48. In her petition for adoption, plaintiff explained to the adoption court that she sought an adoption decree that would establish the legal relationship of parent and child with the minor child, but not sever that same relationship between defendant and the minor child. As we have established, such relief does not exist under Chapter 48. *Id.* §§ 48-1-106, 48-2-606(a)(6), 48-3-606(9). Because plaintiff was seeking relief unavailable under our General Statutes, the adoption proceeding at issue in this case was not "commenced under" Chapter 48 of our General Statutes. *Id.* § 48-2-100 (2005).

A court's subject matter jurisdiction over a particular case is invoked by the pleading. *In re K.J.L.,* 363 N.C. 343, 346-47, 677 S.E.2d 835, 837 (2009) (" 'The purpose . . . of the pleadings[ is] to give juris-

---

2. The subsequent amendments to this statute are immaterial to our analysis. *See* N.C.G.S. § 48-2-100 (2009).

diction of the *subject matter* of litigation . . . .' " (quoting *Peoples v. Norwood*, 94 N.C. 144, 149, 94 N.C. 167, 172 (1886))). The adoption petition filed in this case explained that plaintiff was seeking relief unknown to our adoption law. As the petition sought relief that does not exist under our statutes, the petition did not invoke the adoption court's subject matter jurisdiction. All actions in the proceeding before the adoption court, including the entry of the decree, were therefore taken without subject matter jurisdiction. *See In re T.R.P.*, 360 N.C. 588, 593, 636 S.E.2d 787, 792 (2006) (determining that a court did not have subject matter jurisdiction over a subsequent custody review hearing since the court's subject matter jurisdiction was not invoked at the outset of a juvenile case). Accordingly, the adoption decree at issue in this case is void *ab initio*. *Id.* at 590, 636 S.E.2d at 790 (citations omitted).

Plaintiff contends that the legality of the adoption decree notwithstanding, defendant may no longer contest its validity. In support of this contention, plaintiff cites N.C.G.S. § 48-2-607(a), which states in part that "after the final order of adoption is entered, no party to an adoption proceeding nor anyone claiming under such a party may question the validity of the adoption because of any defect or irregularity, jurisdictional or otherwise, in the proceeding, but shall be fully bound by the order." *Id.* § 48-2-607(a) (2009). We note that the Court of Appeals rejected this argument in its opinion below, recognizing that this statute does not preclude a challenge to a court's subject matter jurisdiction. *Boseman*, —— N.C. App. at ——, 681 S.E.2d at 378 ("[T]he only avenue by which [defendant] can contest the adoption is to show that it was void *ab initio*, a legal nullity."). As we have long held, a void judgment has no legal effect; it is a legal nullity that may be challenged at any time. *In re T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790 (citation omitted); *Stroupe v. Stroupe*, 301 N.C. 656, 662, 273 S.E.2d 434, 438 (1981); *City of Monroe v. Niven*, 221 N.C. 362, 365, 20 S.E.2d 311, 313 (1942) ("The passage of time, however great, does not affect the validity of a judgment; it cannot render a void judgment valid." (citations and quotation marks omitted)); *Casey v. Barker*, 219 N.C. 465, 467-68, 14 S.E.2d 429, 431 (1941) (citations omitted); *Ellis v. Ellis*, 190 N.C. 418, 422, 130 S.E. 7, 9 (1925) (citation omitted); *Clark v. Carolina Homes, Inc.*, 189 N.C. 703, 708, 128 S.E. 20, 23-24 (1925) (citations omitted); *Carter v. Rountree*, 109 N.C. 21, 23, 109 N.C. 29, 32, 13 S.E. 716, 717 (1891).

Moreover, the General Assembly intended for N.C.G.S. § 48-2-607 to shield from further review only those decrees entered by courts

having subject matter jurisdiction. "It is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law." *State v. Benton*, 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970) (citations omitted). " 'A universal principle as old as the law is that the proceedings of a court without jurisdiction of the subject matter are a nullity,' " *In re T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790 (quoting *Burgess ex rel. Burgess v. Gibbs*, 262 N.C. 462, 465, 137 S.E.2d 806, 808 (1964)), and without subject matter jurisdiction, "a court has no power to act," *id.* (citing *Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956)). Because we assume the General Assembly enacted N.C.G.S. § 48-2-607 with full knowledge that subject matter jurisdiction "cannot be conferred upon a court by consent, waiver or estoppel," 360 N.C. at 595, 636 S.E.2d at 793 (citations and quotation marks omitted), the legislature's words "no party," "defect" and "irregularity" indicate that this statute is designed to foreclose challenges other than subject matter jurisdiction. *See* N.C.G.S. § 48-2-607(a). The adoption court in this case had no authority to act in a proceeding seeking relief unknown to Chapter 48. *See State v. Verrier*, 173 N.C. App. 123, 130, 617 S.E.2d 675, 680 (2005) ("It is outside the realm of this Court's function as the judiciary to modify statutory law."). Because the adoption court had no authority to act, N.C.G.S. § 48-2-607 does not apply to its decree.

The argument that the child will lose legal benefits if the adoption is not upheld must also be rejected. The record shows that this new form of judicially-created adoption may have been available only in Durham County and not available in the other counties of North Carolina. If our uniform court system is to be preserved, a new form of adoption cannot be made available in some counties but not all. This Court has the responsibility to ensure that the law is applied uniformly in all our counties. N.C. Const. art. IV. Accordingly, any best interests evaluation is limited to legal benefits that are equally available under the law to all children. *See State v. Holden*, 64 N.C. 702, 704, 64 N.C. 829, 831 (1870) ("The intention of the Legislature and the remedy aimed at are manifest, and under such circumstances it is the duty of Judges to give such an interpretation of the law as shall 'suppress the mischief and advance the remedy, putting down all subtle inventions and evasions for continuance of the mischief . . . and adding force and life to the cure and remedy, according to the true intent of the makers of the act . . . .' " (citation omitted)).

We recognize that many policy arguments have been made to this Court that the adoption in this case ought to be allowed.

However, adoption is a statutory creation. *Wilson*, 232 N.C. at 215, 59 S.E.2d at 839. Accordingly, those arguments are appropriately addressed to our General Assembly. Until the legislature changes the provisions of Chapter 48, we must recognize the statutory limitations on the adoption decrees that may be entered. Because the adoption decree is void, plaintiff is not legally recognized as the minor child's parent.

[2] We are now left with a custody dispute between a parent and a third party. The Court of Appeals did not pass upon this issue. The trial court, however, concluded that defendant "has acted inconsistent with her paramount parental rights and responsibilities" before determining that the parties "are fit and proper persons to have custody" of the minor child "and it is in the best interest of the child for the parties to have joint legal custody of him," providing an alternative basis for its custody decision. Defendant contends that the trial court erred by concluding that she has acted inconsistently with her constitutionally protected, paramount parental status. As defendant does not challenge the findings on which this decision is based, we review this conclusion de novo, *see Adams v. Tessener*, 354 N.C. 57, 65, 550 S.E.2d 499, 504 (2001), and determine whether it is supported by "clear and convincing evidence," *id.* at 63, 550 S.E.2d at 503 (citation omitted).

A parent has an "interest in the companionship, custody, care, and control of [his or her children that] is protected by the United States Constitution." *Price v. Howard*, 346 N.C. 68, 73, 484 S.E.2d 528, 531 (1997); *Petersen v. Rogers*, 337 N.C. 397, 400, 445 S.E.2d 901, 903 (1994). So long as a parent has this paramount interest in the custody of his or her children, a custody dispute with a nonparent regarding those children may not be determined by the application of the "best interest of the child" standard. *Price*, 346 N.C. at 79, 484 S.E.2d at 534 (citations omitted).

A parent loses this paramount interest if he or she is found to be unfit or acts inconsistently "with his or her constitutionally protected status." *David N. v. Jason N.*, 359 N.C. 303, 307, 608 S.E.2d 751, 753 (2005). However, there is no bright line beyond which a parent's conduct meets this standard. *See Price*, 346 N.C. at 79, 484 S.E.2d at 534-35. As we explained in *Price*, conduct rising to the "statutory level warranting termination of parental rights" is unnecessary. *Id.* at 79, 484 S.E.2d at 534. Rather, "[u]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct . . . can also rise to this level

BOSEMAN v. JARRELL

[364 N.C. 537 (2010)]

so as to be inconsistent with the protected status of natural parents." *Id.* at 79, 484 S.E.2d at 534-35.

As the trial court found, this is not a case in which the natural parent is unfit, or has abandoned or neglected the child. The trial court found that defendant is a fit parent with whom the minor child has a "very loving and respectful relationship." Accordingly, we must determine whether defendant has engaged in some other conduct inconsistent with her paramount parental status. Though determining whether the trial court erred is a fact-sensitive inquiry, we are guided in our analysis by decisions of this Court and the Court of Appeals.

In *Price v. Howard* we observed a custody dispute between a natural mother and a nonparent. The child in that case was born into a family unit consisting of her natural mother and a man who the natural mother said was the child's father. *Id.* at 83, 484 S.E.2d at 537 ("Knowing that the child was her natural child, but not plaintiff's, she represented to the child and to others that plaintiff was the child's natural father."). The mother "chose to rear the child in a family unit with plaintiff being the child's *de facto* father." *Id.*

After illustrating the creation of the family unit in *Price*, we focused our attention on the mother's voluntary grant of nonparent custody. *Id.* We stated:

> This is an important factor to consider, for, if defendant had represented that plaintiff was the child's natural father and voluntarily had given him custody of the child for an indefinite period of time with no notice that such relinquishment of custody would be temporary, defendant would have not only created the family unit that plaintiff and the child have established, but also induced them to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated.

> However, if defendant and plaintiff agreed that plaintiff would have custody of the child only for a temporary period of time and defendant sought custody at the end of that period, she would still enjoy a constitutionally protected status absent other conduct inconsistent with that status.

*Id.* (citation omitted). Thus, under *Price*, when a parent brings a nonparent into the family unit, represents that the nonparent is a parent, and voluntarily gives custody of the child to the nonparent without creating an expectation that the relationship would be termi-

nated, the parent has acted inconsistently with her paramount parental status.

In *Mason v. Dwinnell*, 190 N.C. App. 209, 660 S.E.2d 58 (2008), our Court of Appeals applied our decision in *Price* to facts quite similar to those in the case *sub judice*. In *Mason* the parties "jointly decided to create a family and *intentionally* took steps to identify [the nonparent] as a parent of the child." *Id.* at 222, 660 S.E.2d at 67. These steps included "using both parties' surnames to derive the child's name, allowing [the nonparent] to participate in the pregnancy and birth, [and] holding a baptismal ceremony at which [the nonparent] was announced as a parent." *Id.* at 222-23, 660 S.E.2d at 67. After the child's birth, the parties acted as a family unit. *Id.* at 223, 660 S.E.2d at 67. They shared "caretaking and financial responsibilities for the child." *Id.* As a result of the parties' creation, the nonparent "became the only other adult whom the child considers a parent." *Id.* (internal quotation marks omitted).

The parent in that case also relinquished custody of the minor child to the nonparent with no expectation that the nonparent's relationship with the child would be terminated. *Id.* The parent "chose to share her decision-making authority with [the nonparent]." *Id.* The parent also executed a "Parenting Agreement" in which she "agreed that [the nonparent] should participate in making 'all major decisions regarding their child.' " *Id.* In that document the parent also stated that

> she and [the nonparent] had committed to "jointly parent" the child; that [the parent] would consent to [the nonparent]'s adoption of the child if allowed by North Carolina law; that "although [the nonparent] is not the biological mother, she is a *de facto* parent who has and will provide the parties' child with a stable environment and she has formed a psychological parenting relationship with the parties' child;" that the child's relationship with [the nonparent] "should be protected and promoted to preserve the strong emotional ties that exist between them;" and that the purpose of the document was to make provisions for the continuation of the relationship should [the parties] cease to live together.

190 N.C. App. at 224, 660 S.E.2d at 67-68. As such, the natural parent created along with the nonparent a family unit in which the two acted as parents, shared decision-making authority with the nonparent, and manifested an intent that the arrangement exist indefinitely.

The Court of Appeals recognized that the degree of custody relinquishment in *Mason* differed from that in *Price. Id.* at 225, 660 S.E.2d at 68. In *Price*, though there remained a factual issue regarding whether the relinquishment was intended to be only temporary, the natural parent completely relinquished custody of the child for some period of time. 346 N.C. at 82-83, 484 S.E.2d at 536-37. In *Mason*, on the other hand, the natural parent did not completely relinquish custody. 190 N.C. App. at 225, 660 S.E.2d at 68. However, the natural parent in *Mason* did completely relinquish her paramount parental right to make decisions regarding her child by voluntarily "sharing decision-making" authority with the nonparent. *Id.* at 225, 660 S.E.2d at 68-69. After observing this difference in degree, the Court of Appeals explained, and we think rightly so, that the similarity in both cases is that if a parent cedes paramount decision-making authority, then, so long as he or she creates no expectation that the arrangement is for only a temporary period, that parent has acted inconsistently with his or her paramount parental status. *See id.* at 225-28, 660 S.E.2d at 68-70.

The record in the case *sub judice* indicates that defendant intentionally and voluntarily created a family unit in which plaintiff was intended to act—and acted—as a parent. The parties jointly decided to bring a child into their relationship, worked together to conceive a child, chose the child's first name together, and gave the child a last name that "is a hyphenated name composed of both parties' last names." The parties also publicly held themselves out as the child's parents at a baptismal ceremony and to their respective families. The record also contains ample evidence that defendant allowed plaintiff and the minor child to develop a parental relationship. Defendant even "agrees that [plaintiff] . . . is and has been a good parent."

Moreover, the record indicates that defendant created no expectation that this family unit was only temporary. Most notably, defendant consented to the proceeding before the adoption court relating to her child. As defendant envisioned, the adoption would have resulted in her child having "two legal parents, myself and [plaintiff]." In asking the adoption court to create such a relationship, defendant represented that she and plaintiff "have raised the [minor child] since his birth and have jointly and equally provide[d] said child with care, support and nurturing throughout his life." Defendant explained to the adoption court that she "intends and desires to co-parent with another adult who has agreed to adopt a child and share parental responsibilities." Thus, defendant shared parental responsibilities

with plaintiff and, when occurring in the family unit defendant created without any expectation of termination, acted inconsistently with her paramount parental status. The record contains clear and convincing evidence in support of that conclusion.

The Court of Appeals erred in determining that the adoption decree at issue in this case is valid. We hold that the decree is void *ab initio* and that plaintiff is not a legally recognized parent of the minor child. However, because defendant has acted inconsistently with her paramount parental status, the trial court did not err by employing the "best interest of the child" standard to reach its custody decision. Thus, we reverse the Court of Appeals' decision regarding the validity of the adoption decree and affirm as modified its conclusion leaving undisturbed the trial court's custody award. We remand this case to the Court of Appeals for further remand to the trial court for actions not inconsistent with this opinion.

MODIFIED AND AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

Justice TIMMONS-GOODSON dissenting.

[A]fter the final order of adoption is entered, no party to an adoption proceeding nor anyone claiming under such a party may question the validity of the adoption because of any defect or irregularity, *jurisdictional or otherwise*, in the proceeding, but shall be fully bound by the order.

N.C.G.S. § 48-2-607(a) (2009) (emphasis added).

Because Melissa Ann Jarrell is statutorily barred from challenging the adoption decree, I dissent.

The legislature identified two narrow situations when challenges are allowed, and neither permits Jarrell's challenge. *Id.* First, Jarrell did not appeal within thirty days of the final adoption decree. *Id.* § 48-2-607(b) (2009). Second, she failed to move to set aside the decree within six months of a discovery that her consent to the adoption was obtained by fraud or duress. *Id.* § 48-2-607(c) (2009). Instead, Jarrell challenged the adoption nearly two years after entry of the final adoption decree. This she cannot do. The plain language of N.C.G.S. § 48-2-607(a) bars her claim.

This Court must respect the statutory limitations imposed by the legislature and should not reach substantive issues not before it. The

legislature determined it to be in the best interest of minors that adoptions be final, *see id.* §§ 48-1-100(b)(1) (2009), 48-2-607(a), and allowed challenges in narrow circumstances, none of which are satisfied in this case. The wisdom of these restrictions to adoption challenges is an issue for the legislature to decide, not this Court. And if the members of our General Assembly wish to modify these restrictions, it is their prerogative and role to do so.

Justice HUDSON dissenting.

Today a majority of this Court acts contrary to explicit statutory language and legislative intent in order to achieve this outcome. Because I am not willing to read into statutes language that simply is not there, I dissent.

By its unambiguous language, the General Assembly has emphasized the overriding legislative goals of promoting the finality of adoptions and making primary the best interests of the child when construing Chapter 48. N.C.G.S. § 48-1-100 (2009). To that end, a final adoption decree that was not appealed may be set aside at a date as late as the one here only if the natural parent shows by clear and convincing evidence within six months of the reasonable date of discovery that his or her consent was obtained by fraud or duress. *Id.* § 48-2-607(c) (2009). Defendant Melissa Ann Jarrell has made no such allegations, and indeed, the record plainly shows her active, informed, and voluntary consent to plaintiff Julia Boseman's adoption of the minor child. As such, defendant can present no serious argument that any provision in Chapter 48 would authorize a court to set aside the adoption after the passage of so much time.

Instead, defendant contends that the adoption is void *ab initio*, despite conceding that the jurisdictional requirements set forth in N.C.G.S. § 48-2-100 were fully satisfied here. According to defendant, in reasoning largely adopted by the majority opinion, the trial court stripped itself of subject matter jurisdiction by exceeding its statutory authority under Chapter 48 when it allowed defendant to waive the provisions in N.C.G.S. § 48-1-106(c) (stating that a legal effect of an adoption decree is to sever the relationship between the adoptee and his natural parents) and § 48-3-606(9) (requiring the natural parent's consent to include a recognition that the adoption decree will terminate all parental rights with respect to the minor child). Defendant offers no authority for this approach to subject matter jurisdiction, and I have found none. Instead, the majority opinion

today creates an entirely new formulation of the law of subject matter jurisdiction.

The underlying premise of the majority's holding, that the trial court was not authorized under Chapter 48 to waive the provisions of N.C.G.S. § 48-1-106(c) and § 48-3-606(9) concerning termination of defendant's parental rights, at most could amount to an error of law. Our case law makes clear that any such error would neither divest the trial court of, nor even implicate, its subject matter jurisdiction or authority to grant the relief sought by the parties, namely, plaintiff's adoption of the minor child. As such, I conclude that the adoption decree was not void, but merely voidable and subject to the statutory time limits for appeal. Because this challenge is time-barred, I would affirm the Court of Appeals.

When outlining the general adoption procedure in Chapter 48, the General Assembly specifically included a section titled "Jurisdiction," which states in pertinent part:

(b) Except as provided in subsection (c) of this section, *jurisdiction over adoption proceedings commenced under this Chapter exists* if, at the commencement of the proceeding:

    (1) The adoptee has lived in this State for at least the six consecutive months immediately preceding the filing of the petition or from birth, and the prospective adoptive parent is domiciled in this State; or

    (2) The prospective adoptive parent has lived in or been domiciled in this State for at least the six consecutive months immediately preceding the filing of the petition.

*Id.* § 48-2-100 (2005) (emphasis added).[3] These are the only statutory requirements before a North Carolina court may exercise jurisdiction over adoption proceedings. Here the trial court found as fact, properly affirmed by the Court of Appeals, that plaintiff, defendant, and the minor child all fulfilled the North Carolina residency requirements necessary to establish the trial court's subject matter jurisdiction over the adoption under N.C.G.S. § 48-2-100. No party disputes

---

3. This statutory language was in effect when the petition for adoption was filed in this case, and subsequent amendments to remove barriers to adoption of North Carolina children by residents of other states, *see* Act. of Oct. 1, 2007, ch. 151, sec. 2, 2007 N.C. Sess. Laws 255, 255-56; N.C.G.S. § 48-2-100 (2009), do not affect my analysis here.

that these statutory requirements were met, or challenges the trial court's personal jurisdiction over the parties.

The majority acknowledges that the General Assembly specifically enacted a section in Chapter 48 entitled "Jurisdiction" and that those requirements were fully met here. The majority then reads into that section an additional requirement that does not actually appear in Chapter 48, to wit: that the trial court may not enter an order waiving certain statutory provisions. Based upon this new requirement, the majority then determines that the district court divested itself of jurisdiction by entering such an order, even though the statutory requirements for jurisdiction were satisfied. As such, reasons the majority, this adoption decree is void *ab initio* rather than potentially voidable for error. This new approach to subject matter jurisdiction—to ignore the statutory requisites and instead create our own—runs counter to the language of N.C.G.S. § 48-2-100, and decades of jurisprudence on subject matter jurisdiction. Indeed, had the General Assembly intended such a requirement, the "Jurisdiction" section makes obvious that legislators are more than capable of drafting it.

The Court's holding today implies that a court may be stripped of subject matter jurisdiction by its own action, a conclusion inconsistent with long-standing case law:

> Once the jurisdiction of a court . . . attaches, the general rule is that it will not be ousted by subsequent events. . . . Jurisdiction is not a light bulb which can be turned off or on during the course of the trial. Once a court acquires jurisdiction over an action it retains jurisdiction over that action throughout the proceeding. . . . If the converse of this were true, it would be within the power of the defendant to preserve or destroy jurisdiction of the court at his own whim.

*See In re Peoples*, 296 N.C. 109, 146, 250 S.E.2d 890, 911 (1978) (third alteration in original) (citations and internal quotation marks omitted), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979). Moreover, if the trial court lacked jurisdiction *ab initio*, then the order defendant now uses to challenge the validity of the adoption must itself be void and of no effect. As such, that order could not serve as the basis for successfully challenging the jurisdiction of the court. In holding that the order does so serve, the majority adopts circular reasoning and has allowed this defendant to "destroy jurisdiction of the court at

[her] own whim," by asking the district court to enter the order she now claims deprived it of jurisdiction.[4] *Id.*

In my view, defendant's arguments that the adoption is void *ab initio*, making it "a nullity [which] may be attacked either directly or collaterally," *State v. Sams*, 317 N.C. 230, 235, 345 S.E.2d 179, 182 (1986) (citations omitted), must necessarily fail in light of the long-established rule that "[a]n order is void *ab initio* only when it is issued by a court that does not have jurisdiction," *id.*; *see also Travis v. Johnston*, 244 N.C. 713, 719-20, 95 S.E.2d 94, 99 (1956) ("To have validity a judgment must be rendered by a court which has authority to hear and determine the questions in dispute and control over the parties to the controversy or their interest in the property which is the subject matter of the controversy. When these tests are met, the judgment rendered by the court is not void." (citations omitted)).

A judgment is not rendered void *ab initio*, nor is a trial court divested of subject matter jurisdiction or authority to enter a judgment, because of a failure to follow proper procedure or even because of an error of law. *See Ellis v. Ellis*, 190 N.C. 418, 422, 130 S.E. 7, 9 (1925) (noting "the established principle that where the court has jurisdiction of both the subject-matter and the parties and acts within its power, the binding force and effect of a judgment is not impaired because the same has been erroneously allowed, though the error may be undoubted and apparent on the face of the record" (citations omitted)); *Peoples v. Norwood*, 94 N.C. 162, 166, 94 N.C. 167, 172 (1886) ("[W]hen the parties are voluntarily before the [c]ourt, and . . . a judgment is entered in favor of one party and against another, such judgment is valid, although not granted according to the orderly course of procedure." (citations omitted)).

While a void judgment "is in legal effect no judgment," as "[i]t neither binds nor bars any one, and all proceedings founded upon it are worthless," *Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956) (citation and quotation marks omitted), "[a]n erroneous judgment should be corrected by appeal or *certiorari*," *Ellis*, 190 N.C. at 422, 130 S.E. at 9; *see also Daniels v. Montgomery*

---

4. Although not argued here, this Court in an unrelated case has applied the doctrine of judicial ·estoppel to bind a party to a settlement he acknowledged (unsworn) in open court and later refused to perform. *Powell v. City of Newton*, —— N.C. ——, —— S.E.2d —— (2010) (No. 482A09). The Court of Appeals and ultimately this Court applied the doctrine even though it was not argued in the trial court or the Court of Appeals. Here, Jarrell sought, in a verified pleading, the order she now repudiates, arguably an even clearer scenario in which to apply estoppel.

*Mut. Ins. Co.*, 320 N.C. 669, 676, 360 S.E.2d 772, 777 (1987) (" 'An irregular order, one issued contrary to the method of practice and procedure established by law, is voidable.' . . . An erroneous order may be remedied by appeal; it may not be attacked collaterally." (citations omitted)); *Worthington v. Wooten*, 242 N.C. 88, 92, 86 S.E.2d 767, 770 (1955) (stating that a judgment, "even if irregular or even erroneous was binding on the parties, unless set aside or reversed on appeal . . . provided the court had jurisdiction of the person and the subject matter." (citations omitted)); *see also Sawyer v. Slack*, 196 N.C. 697, 146 S.E. 864 (1929) (holding that, partly because of the strong public policy in favor of marriage and maintaining familial relationships and rights, the marriage of an underage female without the parental consent required by statute was not void but voidable).

The time limits for appeal or challenge to this adoption must be read in accordance with the General Assembly's forceful statement of legislative intent in the opening section of Chapter 48, notably not mentioned in the majority opinion:

**Legislative findings and intent; construction of Chapter**

(a) The General Assembly finds that it is in the public interest to establish a clear judicial process for adoptions, *to promote the integrity and finality of adoptions, to encourage prompt, conclusive disposition of adoption proceedings*, and to structure services to adopted children, biological parents, and adoptive parents that will provide for the needs and protect the interests of all parties to an adoption, particularly adopted minors.

(b) With special regard for the adoption of minors, the General Assembly declares as a matter of legislative policy that:

(1) The *primary purpose* of this Chapter is to advance the welfare of minors by (i) *protecting minors from unnecessary separation from their original parents*, (ii) facilitating the adoption of minors in need of adoptive placement by persons who can give them love, care, security, and support, (iii) protecting minors from placement with adoptive parents unfit to have responsibility for their care and rearing, and (iv) *assuring the finality of the adoption*; and

(2) Secondary purposes of this Chapter are (i) to protect biological parents from ill-advised decisions to relinquish a child or consent to the child's adoption, (ii) to protect

adoptive parents from assuming responsibility for a child about whose heredity or mental or physical condition they know nothing, (iii) to protect the privacy of the parties to the adoption, and (iv) to discourage unlawful trafficking in minors and other unlawful placement activities.

N.C.G.S. § 48-1-100 (emphases added); *see also In re Adoption of Anderson*, 360 N.C. 271, 275-76, 624 S.E.2d 626, 628 (2006) (noting that "the General Assembly recognized the public interest in establishing a clear judicial process for adoptions" and "promoting the integrity and finality of adoptions" (citation, internal quotation marks, and brackets omitted)).

Consistent with its legislative intent "to establish a clear judicial process for adoptions," including the "prompt, conclusive disposition of adoption proceedings," *id.* § 48-1-100(a), and its primary purpose of "assuring the finality of" adoptions, *id.* § 48-1-100(b)(1), the General Assembly mandated carefully delineated time limits and circumstances for appeals or challenges to a final adoption. Direct appeal of an adoption decree entered by a district court judge is allowed if filed within thirty days after the adoption becomes final, *id.* § 48-2-607(b) (2009), or within six months of the time a natural parent's consent or relinquishment "was obtained" or "ought reasonably to have been discovered" to have been obtained "by fraud or duress," *id.* § 48-2-607(c). A natural parent may also revoke his or her consent within seven days of a consent to adoption, *id.* § 48-3-608(a) (2009), or within five days after receipt of a preplacement assessment in a direct placement adoption, *id.* § 48-3-608(b) (2009). A consent is void if clear and convincing evidence establishes that it was obtained by fraud or duress, or if the parties mutually agree to set it aside, if the petition to adopt is voluntarily dismissed with prejudice, or if the court dismisses the petition to adopt and either no appeal is taken or the dismissal is affirmed on appeal and all appeals have been exhausted. *Id.* § 48-3-609(a) (2009).

Outside these specific situations, however, the General Assembly explicitly prohibits any challenge after a final order of adoption is entered. Through the unequivocal language of the section of Chapter 48 titled "Appeals," the legislature has established its preference for the finality of adoptions over correcting procedural irregularities:

(a) Except as provided in subsections (b) and (c) of this section, *after the final order of adoption is entered, no party to an adoption proceeding nor anyone claiming under such a party*

*may question the validity of the adoption because of any defect or irregularity, jurisdictional or otherwise, in the proceeding, but shall be fully bound by the order.* No adoption may be .attacked either directly or collaterally because of any procedural or other defect by anyone who was not a party to the adoption. The failure on the part of the court or an agency to perform duties or acts within the time required by the provisions of this Chapter shall not affect the validity of any adoption proceeding.

*Id.* § 48-2-607(a) (2009) (emphasis added).[5] This strong preference is further evidenced in provisions that sanction final adoption decrees despite omissions of required information and vesting courts with a certain degree of leeway to determine compliance with statutory requirements. *See, e.g., id.* § 48-2-306(b) (2009) ("After entry of a decree of adoption, omission of any information required [to be in the · adoption petition, including consent and/or relinquishments] by G.S. 48-2-304 and G.S. 48-2-305 *does not invalidate the decree.*" (emphasis added)); *id.* § 48-2-603(a)(4) (2009) (providing that, at the hearing on or "[e]ach necessary consent, relinquishment, waiver, or judicial order terminating parental rights, has been obtained and filed . . . and the time for revocation has expired").

Here, despite the passage of so much time, defendant would have us invalidate the adoption decree, even though she expressly consented to any irregularity, and even though taking such action is contrary to statutory language prioritizing finality over strict procedural compliance. Defendant first sought to challenge plaintiff's adoption of the minor child in a custody proceeding in May 2007, nearly two years after the final adoption decree was entered in August 2005, and well after expiration of the time limits for an appeal specified in N.C.G.S. § 48-2-607. The waivers she now disclaims should fall squarely within the General Assembly's prohibition against untimely

5. Citing to, but not quoting, this statute, the majority maintains that "the legislature's words 'no party,' 'defect' and 'irregularity' indicate that this statute is designed to foreclose 'waivable' challenges in a court with subject matter jurisdiction." I reiterate that statement here, while including the actual statutory language, to highlight that the majority must necessarily read words (at least the word "waivable") into N.C.G.S. § 48-2-607, while ignoring the words "any" and "fully bound," as well as the lack of a qualifier for "jurisdictional," in order to reach its interpretation of this purported legislative intent.

This approach is at odds with the majority's reliance on *In re D.L.H.*, which states the maxim that when a statute is clear and unambiguous, "there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." 364 N.C. 214, 221, 694 S.E.2d 753, 757 (2010) (citation omitted).

appeals claiming "any defect or irregularity, jurisdictional or otherwise." *Id.* § 48-2-607(a). Nothing in the statutory language itself supports defendant's position, or the majority's endorsement of it. Rather, such a holding is contrary to the unequivocally stated primary legislative goal of assuring the finality of adoptions.[6]

The holding here likewise runs afoul of the General Assembly's categorical directive that Chapter 48 be construed in a manner to ensure that "the needs, interests, and rights of minor adoptees are *primary*." N.C.G.S. § 48-7-100(c) (emphasis added). Moreover, the legislature has instructed that "[a]ny conflict between the interests of a minor adoptee and those of an adult *shall be resolved in favor of the minor*," *id.* (emphasis added), and Chapter 48 should be "liberally construed and applied to promote its underlying purposes and policies," N.C.G.S. § 48-1-100(d), such as "the integrity and finality of adoptions" and the "prompt, conclusive disposition of adoption proceedings," *id.* § 48-1-100(a).

These provisions are plain and unambiguous, and appear in statutory text. By contrast, there is neither an explicit prohibition against, nor an explicit authorization of, the waivers at issue here. In the absence of any statutory language indicating legislative intent regarding these waivers, we must be guided by the legislative priorities we do know and thus act to safeguard the best interests of this child by barring this late challenge and promoting the finality of this adoption. Reading into Chapter 48 a jurisdictional requirement that is not there, the majority overlooks the interests of this child and promotes defendant's rights over those of the child, in direct contravention of the law as written.

## CONCLUSION

The majority decision here is at odds with the timetables and express intent of Chapter 48, as well as prior case law on the finality of adoptions. I would hold that at all pertinent times the trial court had jurisdiction, that this appeal is time-barred, and that the adoption decree must stand. Accordingly, I would affirm the Court of Appeals.

---

6. I note as well that this Court has previously considered, and rejected, untimely challenges to final adoption decrees that assert the decree is void for lack of jurisdiction. *See Hicks v. Russell*, 256 N.C. 34, 40-41, 123 S.E.2d 214, 219 (1961); *see also Fakhoury v. Fakhoury*, 171 N.C. App. 104, 613 S.E.2d 729 (rejecting as irrelevant due to the untimeliness of the appeal the argument that "public policy opposes a stepparent adoption when the stepparent, at the time of filing the petition for adoption, does not intend to stay in the marriage with the legal parent"), *disc. rev. denied*, 360 N.C. 62, 621 S.E.2d 622 (2005).